Argued June 25, affirmed as modified July 22, 1974

In the Matter of Kelly, Sean L., Laura J.,
Minor Children.

BRANCH (No. 50,540), *Appellant, v.* KELLY
and STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY, *Respondents.*

524 P2d 548

*Robert L. McKee,* Portland, argued the cause and filed the brief for appellant.

*Harvey W. Keller,* Portland, argued the cause for respondent Carol S. Kelly. With him on the brief was Ira L. Gottlieb, Portland.

No appearance by respondent State ex rel Juvenile Department of Multnomah County.

Before Schwab, Chief Judge, and Langtry and Fort, Judges.

LANGTRY, J.

This is an appeal by the maternal grandmother, who is the petitioner, from an order of the Multnomah County juvenile court, making the subject children wards of the court. Her disagreement with the court's action is not in the wardship, but rather, that the court left the children in the physical custody of their mother, who is her daughter, with supervision for six months by the Children's Services Division (CSD). The only question on appeal is whether the facts justified the court's disposition of the matter.

The grandmother, who had herself given the children's mother an unstable upbringing, resulting in juvenile problems for her, filed the petition when she became dissatisfied with her daughter's care of the children, who are now five and four years of age. The court found that there was reason for the petition, for its findings after a hotly contested hearing where mother and daughter were opponents held:

"* * * [T]he natural mother has left the children for extended periods of time with baby sitters at a time when she was not in school. She has taken a number of trips and has not been available to her children. The Court finds that the children have not received from their mother, Mrs. Kelly, the care, guidance and protection necessary for their physical, mental or emotional well-being but does not find that the conditions and circumstances of the children are such as to endanger their welfare * * *."

The court then continued and found that the children and their home at times in 1973 were dirty, and that, without their mother's knowledge, they had head lice on an occasion when the grandmother took them to a physician.

Besides being made wards of the court, the children were committed to CSD for supervision in their mother's home.

The grandmother had offered a plan whereby the children would be cared for by a relative in a rural community some 35 miles from Portland. She had nothing to offer them herself.

Besides what the court found, the grandmother presses upon us, from the record, the facts that the children's father died in 1971 in a house fire while her daughter showed seeming indifference to his and the children's fate, and that her daughter, who has income from social security and attends Portland State University, lives in a "hippie" culture. In that environment the children are learning language and morals that are shocking and disgusting to the more conventional of our population.

The feelings of the grandmother and the reasons for the court's action are pointed up in the following exchange between them:

"[MRS. BRANCH:] It wasn't until after Bill Kelly's [former husband] death that she paid them [tuition fees] off so she could return to the University of Portland.

"THE COURT: Now, you feel very bitter about the death of your son-in-law, don't you?

"MRS. BRANCH: I don't think it had to happen. Particularly after I saw the pictures in the fire investigator's file.

"THE COURT: What good can become of reliving a tragedy?

"MRS. BRANCH: No one is reliving it.

"THE COURT: She is.

"Are you going to make her live with this for the rest of your life?

"MRS. BRANCH: No.

"THE COURT: Can't it be forgotten?

"MRS. BRANCH: I do think it shows part of her personality.

"THE COURT: Don't you think it's possible for a person to mature?

"MRS. BRANCH: I would love to see that.

"THE COURT: What disposition do you think should be made for the children?

"MRS. BRANCH: I think it would be better for them to be in a home where there is a mother and a father and people that really care about doing things for the children.

"THE COURT: Our law provides that every effort—not in these words—but the principle behind it is that every effort should be made to raise a child in their own home. Don't you believe that every effort ought to be directed toward keeping the child in his or her home?

"MRS. BRANCH: The things that I came across when I visited Dr. Harpole told me some of the things that I hadn't known.

"I really believed that she had been in shock after that fire; I believed it up until recently."

More could be related about the evidence but we find it unnecessary to our conclusions. The judge's remarks quoted above indicate she was well aware of the restrictions of ORS 419.474 (2) concerning disposition of children who become wards of the court. That statute provides that the court shall provide for such

care, guidance and control "preferably in [their] own home * * *" as will lead to their and the public's best interests. *See Dieringer v. Heiney,* 10 Or App 345, 497 P2d 1201 (1972); *Prindel v. Collins,* 4 Or App 618, 482 P2d 540 (1971).

The court's order contemplated supervision by CSD for six months with a review to determine whether there should be termination of wardship at that time. Six months from that date (October 24, 1973) has now expired. We think, in view of the circumstances and the time elapsed during this appeal, that that part of the order should be modified by extending it to six months beyond the date of mandate herein.

Affirmed as modified.